IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **STEVEN ROSATI**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**LONG ISLAND RAILROAD**, **METROPOLITAN TRANSIT AUTHORITY**, and **PATRICK J. FOYE**, individual,<br><br>Defendants. | Case No. 21-cv-08594<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Steven Rosati, by and through his attorneys, as his Complaint against Defendants Long Island Railroad ("LIRR"), Metropolitan Transit Authority ("MTA"), and Patrick J. Foye ("Foye") (collectively, "Defendants"), pursuant to 42 U.S.C. §1983, New York Labor Law, and New York common law for violations of his rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, wrongful discharge, and breach of contract. In support of his causes of action, Plaintiff alleges as follows:

## PARTIES

1. Plaintiff, Steven Rosati, is a citizen of the United States residing in South Carolina.

2. Defendant, Long Island Railroad, is incorporated in the state of New York, and its principal place of business is in Jamaica, New York.

3. Defendant, Metropolitan Transit, is incorporated in the state of New York, and its principal place of business is in New York, New York.

1

4.  Defendant, Patrick J. Foye, is a citizen of the United States, and residing in the state of New York.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

6.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

7.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

8.  Mr. Rosati worked as a conductor for the LIRR from June 2018 to May 11, 2021.

9.  A Collective Bargaining Agreement ("CBA") was entered into by Mr. Rosati's Union, LIRR, and its Trainmen on April 4, 2017. The CBA entered into on April 4, 2017 governed Mr. Rosati's rights while working for the LIRR. (Exhibit A)

10. Article 42, Section (b), of the CBA provides for certain "major offenses" justifying pre-investigation suspension when there is "sufficient reason to believe the employee is guilty of the offense" and that the employee might re-commit the offense if "not withheld from service." In addition, Section (f) provides for notice and limitation periods as concerning the laying of charges against employees and investigations for offenses- specifically a requirement for seventy-two (72) hours written notice, including any specific charge or charges against the employee, in advance of any trial. This section also prohibits the laying of charges for any offense of which the employee's department head has had actual knowledge ten (10) calendar days or more. (Exhibit B)

11. LIRR Rule E was in effect when Mr. Rosati was hired. The Rule provides that Employees must conduct themselves publicly, at all times, whether on or off company property, or paid company time, or whether using any media outlet, in a manner that will not subject the company to criticism or loss of good will. LIRR Rule 801 was in effect when Mr. Rosati was hired, and it specifies duties and responsibilities of train service employees. (Exhibit C)

12. Mr. Rosati operated multiple politically minded social media pages where he began discussing political issues during the month of March 2020.

13. Mr. Rosati managed the "Unfiltered Conservative" page on Twitter and Tik-Tok.

14. Mr. Rosati managed the "Clash Brothers United" page on Twitter and Tik-Tok.

15. Mr. Rosati managed the audio podcast that accompanies "Unfiltered Conservative" and "Clash Brothers United" pages.

16. Mr. Rosati managed the "Unfiltered Conservative" and "Clash Brothers United" pages on Twitter and Tik-Tok outside of working hours.

17. Mr. Rosati regularly updated his subscribers on the latest political news and campaigns for conservative candidates and causes on these social media pages. Specifically, Mr. Rosati discussed the origins of the public health crisis, his personal view on the science of vaccinations and masking, foreign policy, and free and fair elections. Mr. Rosati also continuously voiced support and publicly campaigned for conservative candidates.

18. Mr. Rosati's content on these various platforms started to attract more attention and followers around March 2020.

19. During April 2020, the LIRR issued a Mask Compliance Rule which required all persons in a terminal, station, or train to comply with lawful orders and directives regarding mask mandates. Any person who did not comply with an order or directive would be barred from

entering or ejected from any terminal, station, or train, in addition to a fine of $50. This policy was not an official mask mandate and was not uniformly enforced by LIRR managerial personnel. (Exhibit D)

20. On June 15, 2020, the MTA released a Memorandum titled "Guidance on Social Media Use." The MTA stated this Memorandum was created in response to the George Floyd incident. The MTA informed its employees that they should be mindful of political posts, irrespective of whether they are publicly identified as MTA employees, and that employees who violate MTA policies may be subject to discipline up to and including termination. (Exhibit E)

21. On June 18, 2020, the MTA enacted its "Respectful Workplace Policy." This policy is extremely vague and overbroad. It applies to content posted on social media platforms regardless of whether the employee is working or posting off the job. It classifies "disrespectful conduct" as posts on social media that "can be hurtful to other people." (Exhibit F)

22. On June 18, 2020, the MTA also enacted its MTA Social Media Policy. This policy targeted MTA employees' content on social media, regardless of whether the employee is working or posting off the job. This policy implored employees to consider whether they would be embarrassed or uncomfortable if their supervisor, co-workers, or customers saw the post. The MTA further stated that if the content of a post would not be acceptable in an in-person conversation with a fellow employee or customer, it is probably not appropriate to post on social media. (Exhibit G)

23. During September 2020, while the LIRR Mask Policy was still in effect, LIRR Manager Dave Caliendo ("Caliendo") posted a photo on Facebook of himself with managers Michelle Walsh ("Walsh"), Libby Walters ("Walters"), and Station Master John Masiello in close proximity on company property on work hours unmasked. Mr. Rosati created a t-shirt with

Caliendo's photograph on it. Mr. Rosati then tagged Caliendo in a Facebook photograph of Mr. Rosati wearing the shirt. Caliendo immediately blocked Mr. Rosati after being tagged. *See* Exhibit H.

24. In the months leading up to the 2020 Presidential Election, Mr. Rosati's social media and podcast episodes campaigned for President Trump's reelection.

25. Prior to October 2020, Mr. Rosati posted on social media his entire career at LIRR in and out of uniform. Mr. Rosati's content was not specifically about his job; rather, he wore his uniform for some of the content and LIRR property was sometimes seen in the background. Mr. Rosati was never confronted about wearing his uniform while creating social media content until October 2020.

26. During October 2020, managerial personnel were informed by other employees of Mr. Rosati's social media content that discussed his own personal views on mask mandates, vaccinations, and his political preferences. Also, during October 2020, Mr. Rosati was called into a meeting with LIRR employees about posting in his uniform. Superintendent Mike Bendick ("Bendick"), Transportation Manager Ben Gallop ("Gallop"), and union representatives EJ Chino ("Chino") and Jay Langlan ("Langlan") were all present for the meeting.

27. At this meeting, Mr. Rosati was instructed that he can post whatever content he wanted so long as he was out of uniform. The meeting involved a conversation, and Mr. Rosati was led to believe that there would be no official write up formally documenting the conduct as partly or wholly an offense nor as constituting any formal insubordination. Mr. Rosati complied with the LIRR Managers' request at the October 2020 meeting, and as of that meeting no longer posted social media content in his uniform.

28. During October 2020, Superintendent Bendick clarified the masking policy for Mr. Rosati and specifically instructed him that if he sat in the two-seater away from everyone else on the trains, he did not need to wear a mask.

29. During the months of November 2020 and December 2020 respectively, Mr. Rosati was subjected to a series of incidents that involved unusual targeting and what appeared to be reprisals by LIRR managers under the guise of what they represented was enforcement of the masking policy. Walters approached Mr. Rosati while he was on the phone, off duty, and awaiting the next train and stated that she was going to write him up for not wearing a mask, while he was clearly off the clock. During this period Caliendo went out of his way to approach Mr. Rosati at 11:30 p.m., with no one around Mr. Rosati or on the premises, to instruct him to put on a mask when there was no reason to do so as he was entirely alone on company property late at night.

30. On November 2, 2020, it was announced that Joe Biden won the Presidential Election.

31. Mr. Rosati started a live stream to speak with his followers about the election results he and other people believed to have been inaccurate. He knew that his followers were upset by the outcome of the election and told them everything was "going to be okay." Mr. Rosati used the universal hand signal for "okay" while making that statement. (Exhibit I) Mr. Rosati was not sending any hidden messages to his followers by making that hand signal. It was simply a hand gesture that mirrored the words "everything is going to be okay."

32. During December 2020, Mr. Rosati followed company policy by requesting 30 days in advance to take a personal day on January 6, 2021, to attend protests at the United States Capitol. His request was approved, and he was granted the day off. Mr. Rosati encouraged people on his podcast to go to the Capitol on January 6, 2021, to peacefully protest. (Exhibit J)

33. On January 6, 2021, Mr. Rosati traveled to the U.S. Capitol and exercised his First Amendment right to peacefully protest the results of the election.

34. On January 6, Mr. Rosati was not in his work uniform, nor did he inform anyone that he worked for the LIRR.

35. At 5:00 a.m. Mr. Rosati posted one video of him walking towards the Washington Monument but then immediately took it down. Mr. Rosati himself did not post anything else on January 6, 2021. Mr. Rosati left the Capitol to return home at approximately 4:30 p.m., without incident, and reported to work the next day without any issue or impediment.

36. During his time at the Capitol, without his knowledge, Mr. Rosati was recorded as present in a video of crowd that went viral on social media several weeks later in January 2021. Mr. Rosati did not take that video and he was not aware that he was in the video nor did he instruct or grant permission to anyone to post the video or tag his employer. (Exhibit K)

37. Mr. Rosati returned to work on January 7, 2021, after taking his personal day on January 6, 2021, and protesting peacefully at the Capitol.

38. On January 14, 2021, Mr. Rosati was working on a train out of Long Beach when Walsh approached Mr. Rosati about wearing a mask that did not properly cover his nose and mouth. Mr. Rosati complied with Walsh's request and put on his mask. Mr. Rosati wore his mask until towards the end of the train ride. He then moved to sit in a two-seater, away from everyone else, where he then removed the mask acting pursuant to Superintendent Bendick's statement regarding the mask policy. Mr. Rosati had no reason to believe that Bendick's statement regarding wearing a mask was incorrect, since Bendick was then the Superintendent of LIRR.

39. Walsh approached Mr. Rosati while he was in the two-seater, as the train went into Manhattan, for a second time regarding his mask.  Walsh verbally informed Mr. Rosati that she

was going to mark him down as "non-compliant." Being marked down as "non-compliant" is not a write up, but rather is an acknowledgement that a conversation took place.

40. At this point, Mr. Rosati believed that since Walsh did not have a reason to mark him down as "non-compliant" the first time she approached him when he put the mask on, she was waiting for an opportunity to do so. When Walsh saw Mr. Rosati sitting alone without a mask in the two-seater, she took the opportunity to finally mark him down as "non-compliant," although he was following advice from Bendick, Walsh's superior. In order to avoid unnecessary confrontation, Mr. Rosati told Walsh to "do what she needed to do." When she stated she was marking him down as non-compliant, the second time she approached him, he was sitting in the two-seater without a mask.

41. On January 19, 2021, a Twitter user screenshotted the video that was taken of Mr. Rosati on January 6, 2021. The photo shows Mr. Rosati at the Capitol. This same member tagged the LIRR in a tweet and told the company to investigate Mr. Rosati for being at the Capitol that day. (Exhibit K)

42. On January 19, 2021, Mr. Rosati received a phone call from the company informing him that he was under investigation, and to report to headquarters for a meeting on January 20, 2021. Mr. Rosati was never informed about any charges brought against him that justified this investigation, nor was the meeting scheduled for a specific time.

43. On January 20, 2021, Mr. Rosati arrived at work running fifteen (15) minutes late. As he entered the office to advise his superiors that he was running late, he received a phone call from the crew department asking about his whereabouts and advising him that Management was looking for him. He walked into the office and another Manager was on the phone with Bendick. He overheard Bendick telling the Manager that he [Mr. Rosati] would be paid for that day and the

following day. Mr. Rosati was asked to hand over his work cell phone to the Manager and then went home, as he could not work his shift on January 20 without the work cell phone.

44. On January 21, 2021, at approximately 10:00 a.m., the MTA held a board meeting.[1] At approximately 12:13 p.m. MTA Chairman, Patrick Foye, was asked about Mr. Rosati going to the Capitol on January 6, 2021, and whether disciplinary actions were going to be taken against him.

45. Mr. Foye responded that what Mr. Rosati said on social media was "outrageous, despicable, and the sign he's a jackass. His conduct at the Capitol ought to be investigated and is being investigated," and then turned the floor over to Phil Eng ("Eng"), the President of LIRR.

46. Eng was then asked if Mr. Rosati would be suspended with or without pay. Eng stated that Mr. Rosati would be "suspended with pay, per the CBA."

47. The MTA meeting ended at approximately 12:30 p.m., and, at approximately 1:00 p.m., Mr. Rosati attended the meeting for the investigation. Bendick and the Union Representatives Chino and Langlan were present during questioning.

48. Mr. Rosati was told he was being investigated for violating the MTA Social Media Policy, LIRR Rule E, making a "white supremacy" hand gesture, and for the mask incident with Walsh, an alleged Violation of Rule 801 of the Rules of the Operating Department; Violation of Corporate Safety Rule 900.3.2. Specifically, Mr. Rosati was being investigated about his political social media content where he discussed the origins of the public health crisis, vaccinations and masking, foreign policy, and free and fair elections. At no point during the investigation meeting was his attendance at the Capitol on January 6, 2021 brought up by the meeting attendees.

---

[1] https://new.mta.info/transparency/board-and-committee-meetings/january-2021

49. At the meeting, Rosati replied that he was simply exercising his First Amendment rights by giving his opinion on current political topics. Shortly thereafter, and as announced by Eng at the press conference, Mr. Rosati was told that he was going to be suspended with pay, pending the investigation, as required in the CBA.

50. Mr. Rosati was on his way out of the meeting when Bendick checked his phone and instructed Mr. Rosati to "hold on a minute," showing him a *New York Daily News* article that reported that a LIRR conductor was suspended without pay because he joined the Capitol insurrection. After waiting in the room, as instructed, Gallup came in the room five minutes later and told Mr. Rosati that as of 2:43 p.m. he was **suspended without pay**.

51. On or about January 21 or 22, Mr. Rosati received a Notice of Trial set for January 29, 2021, for 1:00 p.m. This letter was dated January 19, 2021, and the charges were identified as "Failure to Follow a Supervisor's Instruction: Violation of rule 801 of the Rules of Operating Department; Violation of Corporate Safety Rule 900.3.2." This letter referred to the January 14, 2021, incident where Mr. Rosati complied with Walsh's instructions and as per the policy information Bendick furnished to Mr. Rosati, sat in the two-seater alone and took his mask off. (Exhibit L).

52. On or around January 31 to February 1, 2021, Mr. Rosati received a "Notice of Trial" dated January 29, 2021, that stated he was being charged with "Conduct Unbecoming an Employee of the LIRR; Violation of the MTA Respectful Workplace Policy; Violation of the MTA Social Media Policy; Violation of Rule E and 801 of the Rules of the Operating Department." (Exhibit M)  This Notice of Trial corresponded to the subject matter of the investigation on January 21, 2021.

53. This was the first time Mr. Rosati was informed in writing the charges being brought against him and the violations that justified his suspension without pay. The violations that were communicated to him and the written notice never specifically mentioned his January 6th conduct.

54. On or about January 31 to February 1, 2021, Mr. Rosati received three (3) additional and different Notices of Trial all dated January 29, 2021. (Exhibits N, O and P). None of these Notices references his presence and conduct at the Capitol despite the public statements of Mr. Foye and Mr. Eng.

55. One Notice of Trial dated January 29, 2021, instructed Mr. Rosati to be present on February 5, 2021, to face charges enumerated as "Failure to Follow a Supervisors Directive; Violation of the Terms and Conditions of your Collective Bargaining Agreement, Sick Leave Provision and/or Violation of the Corporate Absence Control Policy; Section B.4". Mr. Rosati requested and been granted Management approval to leave early on one of these occasions. Mr. Rosati did not provide the requested Sick Leave Application form by January 26, 2021, as he was already suspended without pay on January 21, 2021. (Exhibit N) The second Notice of Trial dated January 29, 2021, instructed Mr. Rosati to be present on February 5, 2021, to face charges enumerated as "Conduct Unbecoming an Employee of the LIRR; Violation of the Long Island Rail Road Dual Employment Policy; Violation of the MTA All Agency Code of Ethics". (Exhibit O) Mr. Rosati had created a t-shirt featuring pictures of Managers not wearing masks on company property in September 2020 (Exhibit Q) and tagged Caliendo on Facebook in the photo, which prompted Caliendo to block Mr. Rosati on Facebook. Despite the meeting in October 2020 about him posting in uniform, Mr. Rosati's t-shirt projects were never raised by Management. Mr. Rosati received a phone call from a union representative regarding the photo, and that union

representative stated that Walsh had contacted him justifying the Managers not wearing masks in the photo on the t-shirt in the Facebook post.

56. The third Notice of Trial dated January 29, 2021, instructed Mr. Rosati to be present on February 5, 2021, to face charges enumerated as "Violation of Rule D of the Rules of the Operating Department; Violation of the Corporate Absence Control Policy and Procedure (AWOL) and/or Violation of the Terms and Conditions of Your Collective Bargaining Agreement…". Mr. Rosati was about to start his shift as he arrived on January 20, 2021, and was then instructed to hand over his work cell phone to a Manager due to the investigation on the 21, the next day, and was told to go home on January 20, 2021. (Exhibit P)

57. Mr. Rosati was informed by several letters that the trial date was originally scheduled for February 5, but was then told it was pushed back to February 12, then pushed back indefinitely, rescheduled and cancelled again in March, and finally scheduled definitively for April 20, 2021. During this period while the trial was repeatedly pushed back, rescheduled and cancelled, Mr. Rosati was told by the Union VP in February that if he would accept a suspension it would "help you [him] during your [his] criminal investigation". This was the first time Mr. Rosati was informed he was the subject of any criminal investigation.

58. On May 14, 2021, Mr. Rosati was informed by Langlan by telephone that he was officially terminated on May 11, 2021, for Conduct Unbecoming an Employee of the LIRR; Violation of the MTA Respectful Workplace Policy; Violation of the MTA Social Media Policy; Violation of Rule E and 801 of the Rules of the Operating Department.

## COUNT I
### Retaliation Based on Exercise of the Right to Free Speech in Violation of 42 U.S.C. § 1983
**(All Defendants)**

59. Mr. Rosati realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

60. Defendants managed, had authority over, and/or were materially involved in the decision to suspend Mr. Rosati.

61. During Summer 2020 and leading up to the Presidential Election, Mr. Rosati posted several comments in support of former president Donald Trump and his reelection campaign, the origins of the public health crisis, his personal view on the science of vaccinations and masking, foreign policy, and free and fair elections in his private time, outside of the scope of his official duties as a LIRR employee.

62. Mr. Rosati's social media post(s) at issue constitute Constitutionally protected activity commenting as a private citizen on matters of public concern, on personally ran social media accounts.

63. Mr. Rosati attended the protests at the Capitol on January 6, 2021, and exercised his Constitutionally protected rights to protest peacefully. He did so with permission and the full knowledge of LIRR Management and posted no content on that date on his own personally ran social media accounts.

64. At no time did Mr. Rosati communicate to anyone on January 6, 2021, that he was an employee of LIRR or MTA. He was in attendance acting in his own individual capacity and in no way implicated either LIRR or MTA by virtue of his presence or conduct.

65. As a result of Mr. Rosati's attending the protest on January 6, 2021, he was incidentally captured in the background of a video recorded by a third party, and a photo of his activity tagging LIRR was posted on Twitter by another third party.

66. On January 19, 2021, the tweet tagging LIRR in the photo of Mr. Rosati at the Capitol went viral. That same day, Mr. Rosati received the phone call informing him he was under investigation but not provided with any specific reasons.

67. Mr. Rosati was subjected to adverse action by Defendants that would chill an ordinary person from continuing to engage in that protected activity, as the same day the photo taken by a third party without his permission went viral, he was advised he was under investigation.

68. Mr. Rosati's constitutionally protected speech at the Capitol, in respect of which he participated with permission from his employer, is what incited LIRR and MTA to initiate the investigation on January 21. His presence at the Capitol was the impetus for Mr. Foye's public statements to the media on January 21 that Mr. Rosati ought to be investigated and was being investigated.

69. Mr. Foye drew negative attention to Mr. Rosati's presence at the Capitol, asserting claims that were a mischaracterization of Mr. Rosati's presence at the Capitol on January 6, 2021. Mr. Foye had no knowledge that Mr. Rosati did anything other than peacefully demonstrate and assert his First Amendment rights at the U.S. Capitol building.

70. As a result of Mr. Foye's announcement of an investigation based off of his mischaracterization of Mr. Rosati's presence at the Capitol on January 6, LIRR initiated an illegitimate investigation into Mr. Rosati under false pretenses, evidenced by the four letters received around January 31, 2021, asserting a [number of counts] against him, received immediately after Mr. Foye's statement.

71. There was a substantial causal relationship between the Constitutionally protected activity and the adverse action taken by Defendants against Mr. Rosati.

72. Defendants' employees and senior administration claimed to be acting pursuant to official policy in the course initiating an internal investigation in response to Mr. Rosati's presence at the Capitol. The Defendants communicated verbally and in writing that Mr. Rosati was "suspended without pay and then terminated for Conduct Unbecoming an Employee of the LIRR; Violation of the MTA Respectful Workplace Policy; Violation of the MTA Social Media Policy; Violation of Rule E and 801 of the Rules of the Operating Department". However, all of these allegations were addressed in September 2020 and October 2020 when Management had an in-person meeting with Mr. Rosati regarding his t-shirts and social media activities.

73. The timing of LIRR and MTA's investigation into Mr. Rosati's conduct suggests it was the tweet tagging LIRR and the photograph capturing Mr. Rosati's presence at the Capitol on January 6, 2021, that incited the investigation, suspension and termination, as opposed to the reasons provided in the several Notice of Trial letters.

74. The reasons justifying the investigation that led to the suspension and termination, as provided to Mr. Rosati, centered on social media content posted in November 2020 and conduct prior to October 2020. These reasons and the policies giving rise to these reasons, namely, "Conduct Unbecoming an Employee of the LIRR; violation of the MTA Respectful Workplace Policy; Violation of the MTA Social Media Policy; Violation of Rule E and 801 of the Rules of the Operating Department" were arbitrarily exploited as false pretenses to justify retaliation against Mr. Rosati for attending the protests at the Capitol on January 6, 2021.

75. The morning of the January 21 investigation meeting, Chairman Foye announced that Mr. Rosati ought to be and is being investigated on account of his presence at the Capitol.

However as suspending Mr. Rosati for his attendance at the Capitol would be a violation of his First Amendment rights, he was told his suspension and termination were attributed to conduct in late 2020. This conduct had already been addressed in meetings and included his post about how, despite Donald Trump losing the election, everything would be okay. This content was falsely characterized as a white power hand gesture communication, despite it being on the topic of the election.

76. As a direct result of Mr. Rosati exercising his Constitutional right to speak publicly by assembly peacefully at the Capitol, in his own time, as a private citizen, on a matter of public concern, Defendants retaliated against him, including taking adverse employment actions and inciting subordinates to take adverse employment actions by suspending Mr. Rosati's employment and doing so without pay.

77. At the times mentioned herein that were the subject matter of Mr. Foye's comments calling for investigating Mr. Rosati, Mr. Rosati's speech at the Capitol centered on the election results, which were and are matters of widely-debated public concern.

78. Defendants, acting under color of state law, violated Mr. Rosati's First Amendment rights by taking illegitimately motivated employment action against Mr. Rosati that was substantially motivated by Mr. Rosati's presence at the Capitol on January 6, 2021.

79. Defendants were acting within the scope of their employment or agency with the LIRR when Defendants intentionally terminated Mr. Rosati in response to his presence at the Capitol on January 6, 2021.

80. As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Rosati suffered—and continues to suffer—significant damages including psychological and emotional harm, reputational harm, lost promotion opportunities, associated wages and pension

income, and lost future income from post retirement private sector employment opportunities that will be unavailable to him.

81. Defendants acted intentionally and with malice towards Mr. Rosati to deny his freedoms protected by the First Amendment when they suspended and then terminated his employment.

## COUNT II
### Retaliation Under State Law in violation of
### New York Labor Law 201-D
### (All Defendants)

82. Mr. Rosati realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

83. Mr. Rosati was participating, in his capacity as a private citizen, in a public conversation on a topic of national concern when he voiced his support President Donald J. Trump.

84. Defendants, acting within the scope of their employment intentionally suspended and then terminated Mr. Rosati's employment in response his presence at the Capitol on January 6, 2021.

85. Defendants' employees and senior administration were acting pursuant to Conduct Unbecoming of an Employee of the LIRR; the MTA Respectful Workplace Policy; Rule E and 801 of the Rules of the Operating Department, in the course initiating an internal investigation in response to Mr. Rosati's presence at the Capitol on January 6, 2021, making official statements about his conduct at the public board meeting, and suspending him without pay pending the results of the disciplinary proceeding scheduled for April, at which point he was terminated.

86. Defendants' actions in terminating Mr. Rosati were substantially motivated by their disapproval of Mr. Rosati's political viewpoints as captured by his presence at the Capitol on

January 6, 2021, not posted by him, but rather a third party that tagged LIRR in a tweet, drawing negative attention in accordance with January 6 protestors as being rioters[2].

87. By terminating Mr. Rosati's employment, Defendants denied his freedoms protected by New York Labor Law 201-D.

88. As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Rosati suffered—and continues to suffer—significant damages, including reputational harms, lost promotion opportunities and associated wages and pension income, and lost future income from post-retirement private sector employment opportunities that will be unavailable to him.

### COUNT III
### Breach of Collective Bargaining Agreement
### (All Defendants)

89. Mr. Rosati realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90. The discipline section of Mr. Rosati's Collective Bargaining Agreement states that "[n]o charge shall be made that involves any offense of which the employee's department head has actual knowledge ten (10) calendar days or more . . . ."

91. The social media activities that were the subject of Mr. Rosati's January 21, 2021 suspension and later termination occurred in October and November 2020. At the time of the social media activities, Mr. Rosati's supervisors informally spoke with him about the social media activities and took no disciplinary action. Thus, Defendants had actual knowledge of the activities more than ten days before the charges were brought on January 21, 2021.

92. However, Defendants used prior conduct to arbitrarily justify discipline under the CBA in order to punish Mr. Rosati for exercising his First Amendment rights.

---

[2] https://nypost.com/2021/01/21/lirr-worker-suspended-amid-probe-he-was-at-capitol-riot/

93. Thus, Defendants breached the Collective Bargaining Agreement.

94. As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Mr. Rosati suffered—and continues to suffer—significant damages, including reputational harms, lost promotion opportunities and associated wages and pension income, and lost future income from post-retirement private sector employment opportunities that will be unavailable to him.

95. WHEREFORE, Plaintiff demands compensatory, special and punitive damages against Defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees, and other cost as permitted by law.

## **PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants as follows:

i. An award of compensatory, special and punitive damages in appropriate amounts to be proven at trial;
ii. Attorneys' fees;
iii. Experts' fees;
iv. An award of costs associated with this action; and
v. Any and all other or further relief that this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demands a trial by jury on all issues so triable.

Date: October 14, 2022                                  Respectfully Submitted,

                                                           **JACOBS P.C.**

/s/Leo Jacobs
Leo Jacobs, Esq.
Leo@jacobspc.com
8002 Kew Gardens Road
New York, NY 11415
T: (718) 772-8704


**JOHN PIERCE LAW**

John M. Pierce (PHV to be submitted)
jpierce@johnpiercelaw.com
21550 Oxnard Street
3rd Floor, PBM#172
Woodland Hills, CA 91367
Tel: (213) 279-7648

*Counsel for Plaintiff Steven Rosati*