





CARRIER'S EXHIBIT NO. 18

# Okay Hand Gesture



white

power

Racist Hand Signs

*Note: For reasons explained below, particular caution must be used when evaluating this symbol.*

The "okay" hand gesture—in which the thumb and index finger touch while the other fingers of the hand are held outstretched—is an obvious and ancient gesture that has arisen in many cultures over the years with different meanings.

Today, in a usage that dates to at least as early as 17th century Great Britain, it most commonly signals understanding, consent, approval or well-being. Since the early 1800s, the gesture increasingly became associated with the word "okay" and its abbreviation "ok." The gesture is also important in the Hindu

and Buddhist worlds, as well as in yoga, where it is known as *mudra* or *vitarka mudra*, a symbol of inner perfection. The "okay" hand gesture also forms part of the basis for a number of words or concepts in American Sign Language. It appears in many other contexts as well.

Use of the okay symbol in most contexts is entirely innocuous and harmless.

In 2017, the "okay" hand gesture acquired a new and different significance thanks to a hoax by members of the website 4chan to falsely promote the gesture as a hate symbol, claiming that the gesture represented the letters "wp," for "white power." The "okay" gesture hoax was merely the latest in a series of similar 4chan hoaxes using various innocuous symbols; in each case, the hoaxers hoped that the media and liberals would overreact by condemning a common image as white supremacist.

In the case of the "okay" gesture, the hoax was so successful the symbol became a popular trolling tactic on the part of right-leaning individuals, who would often post photos to social media of themselves posing while making the "okay" gesture.

Ironically, some white supremacists themselves soon also participated in such trolling tactics, lending an actual credence to those who labeled the trolling gesture as racist in nature. By 2019, at least some white supremacists seem to have abandoned the ironic or satiric intent behind the original trolling campaign and used the symbol as a sincere expression of white supremacy, such as when Australian white supremacist Brenton Tarrant flashed the symbol during a March 2019 courtroom appearance soon after his arrest for allegedly murdering 50 people in a shooting spree at mosques in Christchurch, New Zealand.

The overwhelming usage of the "okay" hand gesture today is still its traditional purpose as a gesture signifying assent or approval. As a result, someone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention. Since 2017, many people have been falsely accused of being racist or white supremacist for using the "okay" gesture in its traditional and innocuous sense.

Other, similar-seeming hand gestures have also been mistakenly assumed to have white supremacist connotations as a result of the "okay" hoax. One of these is the so-called "Circle Game," in which people attempt to trick each other into looking at an okay-like hand gesture made somewhere below the waist. Another is the hand sign of the Three Percenter movement, a wing of the anti-government extremist militia movement. Three Percenters, who are right-wing extremists but are not typically white supremacists, often make a hand gesture to symbolize their movement that uses the outstretched middle, ring, and pinky fingers to represent a Roman numeral "3." This gesture, from certain angles, can often resemble an "okay" hand gesture and has been misinterpreted by some as a white supremacist symbol.

Because of the traditional meaning of the "okay" hand gesture, as well as other usages unrelated to white supremacy, particular care must be taken not to jump to conclusions about the intent behind someone who has used the gesture.

ADDITIONAL IMAGES:








*TheFocus*

CARRIER'S EXHIBIT NO. 14

# FAFO Proud Boys explained: What does the acronym mean?



Olivia Olphin
4 months ago

As Pro-Trump rallies erupted in cities across the U.S this weekend, the Proud Boys were in attendance. Now, a photo of a Proud Boys member wearing a t-shirt that reads "FAFO Proud Boys" has some people scratching their heads. What does FAFO mean?

## Who are the Proud Boys?

The Proud Boys are a far-right group founded by Gavin McInnes in 2016.

The group have previously been involved in altercations with – and violent action against – left-wing groups. Law enforcement agencies accuse the group of having links to white supremacist ideologies.



Photo by Tasos Katopodis/Getty Images

However, The Proud boys **deny** any far-right connections and simply say that they are spreading "anti-political correctness". The group's values include "Western chauvinism" and policies such as gun ownership.

The group first gained widespread media attention after President Donald Trump's comment to them during one of his election interviews: "Proud Boys, stand back and stand by! But I'll tell you what, somebody's got to do something about antifa and the left."

The president received backlash for these comments and for not publicly denouncing the Proud Boys as a potentially dangerous fringe group. Trump has since backtracked and condemned the

291

actions of the Proud Boys.

The Proud Boys were a prominent part of the pro-Trump rallies taking place this weekend in cities such as Washington D.C.

## What does FAFO mean?

Although the use of the acronym FAFO with relation to the Proud Boys has not been confirmed, the best known use of the term in pop culture means "F*** around and find out".

This weekend, a number of Proud Boys protestors across the country had FAFO emblazoned on their t-shirts, hats and other apparel, along with the colours commonly used by the group – yellow and black.

This definition of FAFO has been supported by a number of users on Twitter.

**Mad Physiologist**
@MadPhysiologist

Replying to @PadraigBelton and @washingtonpost

As a former Philly resident, I can only see this as F*ck Around, Find Out (which is what the shirt acronym means).

4:28 AM · Dec 14, 2020

Our View: How India can manage the absence of Virat Kohli against Australia

Meet Alex Jones ex-colleague Millennial Millie

'Brilliant manager, brilliant man': Liverpool fans pay tribute to Gerard Houllier

Cascarino claims Everton star impressed him more than Werner and Havertz on Saturday

Case 1:21-cv-08594-MMG-SN   Document 100-13   Filed 05/01/24   Page 9 of 14



293

Rosati_LIRR_0288

CARRIER'S EXHIBIT NO. 21

| | Version | User | Desk Id | | Data Source | | Server Date/Time | |
|---|---|---|---|---|---|---|---|---|
| File | Crew | Daily Board | Bulletins | Inquiries | Reports | Absence Control | Window | Help |

Employee Number  58730   Initials / Last / First Name   S   ROSATI   STEVEN   MTA #

Assignment : Permanent                                             Last On Duty Time   01/19/2021 11:25
           Temporary                                                Last Release Time  01/19/2021 21:40
           Current                                                  Available
           Scheduled

Status / Reason   22 ...
Days This Status   77            Status Date   01/21/2021 14:40

| Personal | History | Qual | Restrict | Review | Seniority | Sch Layoff | Phone | Counts |

Start Date  10 19 2020       TRANSFERRED IN              ▲    Query
End Date    10 19 2020       ABS CNTL
                             ACCT ADD NR                 ▼

| Entered Date Time | Function | Terminal | CR | Asgn | Job Id | Pos | Effective Date Time | ST |
|---|---|---|---|---|---|---|---|---|
| 10-09-2020 00:18 | OVERRIDE | BAE | F | 4226 | 4226 | AC | 10-10-2020 00:14 | V |
| 10-09-2020 14:30 | TIE UP | BAE | F | 851 | | TC | 10-09-2020 13:30 | 00 |
| 10-09-2020 05:29 | ON DUTY | BAE | F | 851 | | TC | 10-09-2020 05:30 | W |

Last Update: 03/20/21 3:42:40 By A28735

First  Next  Prev  Last  Refresh                          Cancel

Rosati_LIRR_0289

| | |
|---|---|
| From: | LIRR Corporate Communications |
| Sent: | Friday, June 26, 2020 10:24 AM |
| To: | LIRR Corporate Communications |
| Subject: | Social Media and Respectful Workplace Policies |
| Attachments: | MTA Respectful Workplace Policy Issued June 18, 2020.pdf; MTA Social Media Policy Issued June 18, 2020.pdf |

CARRIER'S EXHIBIT NO. 22

Colleagues,

At the MTA we are committed to conducting business with the highest degree of ethics, integrity and compliance.

Given recent events it is important that you have the freedom to express your opinions in public discussions. It is equally important that, as you engage in these discussions, you recognize that your words and actions matter. More importantly, they can have a direct impact on your fellow colleagues in the workplace and on social media.

We have developed two policies to help guide you in the workplace and on social media.

The Respectful Workplace policy covers represented and non-represented employees, with the exception of the Police Department which has its own set of governance. The policy states that disrespectful conduct, harassment and bullying of co-workers, customers, vendors, contractors or suppliers by employees is prohibited and violates our core values.

Disrespectful conduct can include derogatory comments or jokes based on any class of people, including race, sex, color, religion, sexual orientation, disability, national origin, ethnicity or any other category prohibited by MTA policy; use of degrading words or graphics to describe or refer to an individual or group; spreading false gossip or rumors about an individual or group, and cursing and name calling.

The social media policy establishes mandatory guidelines for the responsible use of all social media by employees, whether for personal or professional use. It is important for you to have the freedom to engage in public discussions on different important topics. It is equally important to remember that when you engage in these discussions' others may know you are an MTA employee, or will quickly be able to determine that you are one.

This is true even where you have chosen not to identify your employer when you are speaking, posting, commenting, or sharing. An individual's social media activity—whether posting, liking, sharing or commenting—is often interpreted by readers as communicating the views of both an individual and their employer, or as likely to have an impact upon the performance of your job and your relations with your co-workers.

You are reminded to be mindful of what you post, share and comment on when using social media. Social media posts by MTA employees that contain racist language, slurs, or images, or posts that threaten, encourage, or incite violence or discrimination, are all contrary to the MTA's mission and values.

As an employee of the MTA the words you use and the action you take matter. If you have any questions regarding these policies or need to report an issue in the workplace, speak with your manager, HR representative or MTA Ethics Helpline at 888-827-5682.

Regards,

Paul Fama and Michael Garner

Chief People Officer, Chief Diversity Officer

ORGANIZATION'S
EXHIBIT NO. ____

## ARTICLE 42
### Discipline

(a) Employees shall not be suspended nor dismissed from the service without a fair and impartial trial.

(b) When a major offense has been committed, an employee considered by the Railroad to be guilty thereof may be held out of service pending trial and decision. The following types of offenses justify pre-investigation suspension when there is sufficient reason to believe the employee is guilty of the offense and that he/she might commit the offense again if not withheld from service: (1) theft; (2) unsafe practices; (3) serious insubordination; (4) threatening or abusive conduct; (5) fighting on duty or on Carrier property; (6) under the influence of alcohol or narcotics while on duty; (7) rape, assault or other serious criminal activities.

(c) An employee who is required to make a formal statement prior to the trial in connection with any matter which may eventuate in the application of discipline to any employee, may, if he/she desires to be represented, be accompanied by a representative of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division.

(d) In the event that the individual involved indicates that he/she does not desire representation, then the Union's representative will take no part in the proceedings except to observe that there is no violation of the Schedule of Working Conditions of Trainmen.

(e)(1) A copy of all statements taken in connection with disciplinary matters shall be furnished to the General Chairman of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division. An employee will be entitled to a copy of his/her own statement if signed by him/her.

(2) Disciplinary suspension, at the Carrier's discretion may be converted to a fine equal to twenty-five percent (25%) of the employee's regular salary for each day of the suspension. The employee will be required to work and pay the fines. The employee's disciplinary record will only reflect the period of the suspension for the purposes of progressive discipline and will not reflect that a fine was paid in lieu of serving a suspension. Carrier will not be permitted to apply fines to work rule violations covered by the FRA or drug and alcohol violations under any authority.

(f) Employees shall be given at least seventy-two (72) hours written notice in advance of the trial, such notice to set forth the specific charge or charges against them. No charge shall be made that involves any offense of which the employee's department head has had actual knowledge ten (10) calendar days or more, except where a civil action or criminal proceeding results from the offense, in which event the charge may be made within thirty (30) calendar days of the final judgment. The trial shall be held at a place to be designated by the Carrier within ten (10) calendar days of the date when notified of the offenses or held from service (subject to one (1) postponement not to exceed an additional ten (10) calendar days).

(g) If the employee desires to be represented at such trial, he/she may be accompanied by a representative of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division or a representative whom the employee has authorized, in writing, to represent him/her. The accused employee or his/her representative shall be permitted to question witnesses whose testimony is presented at the trial insofar as the interests of the accused employee are concerned. Such employee shall make his/her own arrangements for the presence of the said representative and no expense incident thereto shall be borne by the Railroad.

(h) A true copy of the trial record shall be given to the accused employee and the General Chairman of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division.

(i) If discipline is to be imposed following the trial, the employee to be disciplined shall be given written notice thereof by the Chief Transportation Officer at least ten (10) calendar days prior to the date on which the discipline is to become effective, but not later than ten (10) calendar days following the trial, except that in cases involving dismissal, such dismissal may be made effective at any time after decision without advance notice. If the discipline to be applied is suspension, the time the employee is held out of service prior to the serving of the notice of discipline shall be applied against the period of suspension.

(j) Employees dissatisfied with the decisions of the Chief Transportation Officer shall have the right to appeal, either in person or through their duly accredited representative, to the highest designated officer of the Carrier, and a conference shall be granted, provided written request is made to such officer and copy furnished to the Chief Transportation Officer within ten (10) calendar days of the date of receipt of the Chief Transportation Officer's decision. Except in those instances involving dismissals, notices of appeal will serve to stay imposition of discipline until the issue has been otherwise finally adjudicated.

(k) A conference on the appeal shall be held between the Carrier's highest designated officer and the employees or their designated representative of the Organization within twenty (20) calendar days of the date of the appeal. A decision on the appeal shall be rendered within ten (10) calendar days of the date of conference.

(l) Employees dissatisfied with the decisions of the Carrier's highest designated officer shall have the right to appeal, either in person or through their duly accredited representative, to a special board of adjustment established pursuant to this Article, provided written request is made to the Carrier's Director-Labor Relations within ten (10) calendar days of the date of receipt of the highest designated officer's decision.

(m) Upon receipt of timely notification of an appeal, the Carrier's Director-Labor Relations will, within ten (10) calendar days, arrange to docket the appeal for review by the special board of adjustment established pursuant to this Article on the next first date such board is able to meet. Copy of all correspondence related to the docketing of such appeals shall be furnished the employees and the General Chairman of the Organization.

(n) When an employee is held out of service in connection with an offense and is thereafter exonerated, the charge shall be stricken from the employee's record, the employee shall be reinstated to service with his/her seniority

297

22

unimpaired, and the employee will be compensated for the earnings he/she would have received had he/she not been withheld from service or otherwise been required to be present at trial.

(o) Where the term "duly accredited representative" is used in this Article, it is understood to mean the General Chairman or a duly constituted member of the General and Local Committee of Adjustment of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division.

(p) Upon notification that there is a case to be docketed for a hearing before the board, the Carrier will contact those persons selected or designated to serve on the special board of adjustment. The Carrier will contact each successive person on the list who does not then have a docket of cases, and who has not already served the requisite number of months on the board, to determine their availability to hear the new docket of cases within a period of time which is not to exceed thirty (30) calendar days from the date they are being contacted.

(q) When a foreign railroad files charges against an employee covered by this Agreement for an offense occurring on such foreign line, the investigation shall be handled by the railroad involved subject to the provisions of this Article. If, upon completion of such investigation any discipline is to be imposed, the foreign railroad shall recommend in writing to this Carrier's Chief Transportation Officer the discipline that railroad deemed appropriate. If the Carrier's Chief Transportation Officer concurs with the discipline to be imposed, he/she shall so notify the affected employee, in writing, that the recommended discipline shall be placed into effect subject to the provisions of Article 42 hereof. Nothing in this paragraph shall be construed as an abrogation of any right held under the paragraphs of Article 42.

(r) Charges by an employee represented by Sheet Metal, Air, Rail & Transportation Workers-Transportation Division against another employee represented by Sheet Metal, Air, Rail & Transportation Workers-Transportation Division which may lead to discipline must be in writing.

(s)(1) Disciplinary suspensions and reprimands assessed for minor offenses which were placed on an employee's discipline record shall be removed therefrom no less than three (3) years following the date said discipline was assessed. If the discipline assessed was modified by Carrier or a Board of Adjustment, the three (3)-year period will commence from the date the discipline assessed was finally adjusted.

(2) Disciplinary suspensions and reprimands assessed for infractions of operating rules (not including offenses for which the employee was properly removed from service) which were placed on an employee's discipline record shall be removed therefrom no less than five (5) years following the date the discipline was assessed. If the discipline assessed was modified by Carrier or a Board of Adjustment, the five (5)-year period will commence from the date the discipline assessed was finally adjusted.

(3) Train Service Employees who receive a disciplinary suspension as a result of an incident for which they were initially removed from service, shall not less than eight (8) years following final disposition of said incident (either by settlement on the property or by a Board of Adjustment) have the right to request that Carrier review said suspension and remove it from their discipline record. Final decision in this matter will be made by the Chief Transportation Officer.

(t)(1) Employees who are placed on disciplinary suspension will be offered uninterrupted Trainmen's health and welfare benefits coverage for a period of six (6) months.

(2) Employees who are dismissed from service as a result of disciplinary action will be afforded uninterrupted Trainmen's health and welfare benefits coverage effective from the date of dismissal, provided appeals action is instituted and progressed in strict compliance with the procedures established for docketing cases for hearing and adjudication by Special Board of Adjustment No. 884 (employees who elect to accept a trial waiver will also be covered); in the event Special Board of Adjustment No. 884 is closed, the subsequent expedited procedure will control.

(3) This continued benefit coverage will terminate with the rendering of the Board's decision upholding the dismissal or at the end of the sixth calendar month from the date the Notice of Discipline is issued, whatever comes first.

(4) In the event the Board's decision is not rendered within six (6) months due to referee delay or for other extraordinary circumstances beyond the control of the parties, an appropriate extension can be arranged by mutual agreement.

(5) In the event an employee remains on suspension for longer than six (6) months or an extension has not been granted to a dismissed employee who is appealing his/her dismissal through the grievance procedure, such employees may elect to have their health and welfare benefits continued after six (6) months provided they pay the full premium payments to Carrier before the beginning of the seventh and each subsequent month until they return to service or until the dismissal is affirmed by Board award, or the appeal process is otherwise ended. Employees who fail to pay the full premium payment before the beginning of each extension month will have their health and welfare benefits suspended, and these benefits will not be reinstated until they return to service.

## ARTICLE 43
### Placement Of Disabled Trainmen

Nothing in this Agreement shall preclude the assignment in any service of a disabled Trainman to any position of Utility Brakemen or Collector, or the removal of the employee from a Utility Brakemen or Collector position to permit placement of a disabled Trainman when agreed to by the Chief Transportation Officer and the General Chairman of Sheet Metal, Air, Rail & Transportation Workers-Transportation Division.

In the application of the foregoing, seniority shall govern.