UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/18/2026___

STEVEN ROSATI,

                  Plaintiff,

      -against-

LONG ISLAND RAILROAD, et al.,

                  Defendants.

21-CV-08594 (MMG) (SN)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff Steven Rosati, a former employee of the Long Island Railroad (the "LIRR"), brought this action against the LIRR, the Metropolitan Transit Authority (the "MTA"), and Patrick Foye, the former Chairman and CEO of the MTA (collectively, "Defendants"). Rosati alleges Defendants unlawfully initiated an internal investigation against him, suspended him without pay, and ultimately terminated him in retaliation for attending demonstrations at the U.S. Capitol on January 6, 2021, and exercising his free speech rights under the First Amendment, in violation of 42 U.S.C. § 1983 and New York Labor Law § 201-D and in breach of a certain collective bargaining agreement which governed Rosati's rights during the course of his employment. Following discovery, Defendants moved for summary judgment on all claims. Dkt. No. 99. For the reasons set forth below, the Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

#### A. The Parties

Plaintiff Steven Rosati is a former Assistant Conductor, who was employed by the LIRR from June 2018 to May 11, 2021. *See* Defs. 56.1 ¶¶ 1, 101. The LIRR runs a commuter rail system, serving Long Island and Manhattan, and is a subsidiary public benefit corporation of the MTA. *See id.* ¶ 3. The MTA is a public benefit corporation responsible for public transportation in the New York City metropolitan area. *See id.* ¶ 2. Patrick Foye served as Chairman and CEO of the MTA from approximately April 2019 to July 2021. *Id.* ¶ 4.

#### B. LIRR and MTA Policies and Rules

The events in this case occurred in the wake of the COVID-19 pandemic. The public health concerns arising out of the pandemic harmed the LIRR's operations, chiefly by decreasing ridership while increasing operational costs, including costs associated with complying with state

---

[1] The Court primarily sources facts from Defendants' Rule 56.1 Statement of Undisputed Material Facts, *see* Dkt. No. 101 ("Defs. 56.1" or "Defendants' 56.1 Statement"), and the exhibits appended to the Declaration of Helene R. Hechtkopf (Dkt. No. 103, the "Hechtkopf Decl."). The Court also relies on Plaintiff's Rule 56.1 Counterstatement and Statement of Additional Material Facts, *see* Dkt. No. 106-1 ("Pl. 56.1" or "Plaintiff's 56.1 Statement"), when appropriate.

Where a fact stated in Defendants' Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by Plaintiff, the Court finds that fact to be true. *See* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff agrees fully with or admits to a fact set forth in Defendants' Rule 56.1 Statement, the Court cites only to Defendants' Rule 56.1 Statement. Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents cited therein.

The Court refers to the memoranda of law in support of and in opposition to Defendants' motion for summary judgment as follows: Dkt. No. 102 ("Mot."), Dkt. No. 106 ("Opp."), Dkt. No. 107 ("Reply"). The Court refers to the exhibits appended to the Hechtkopf Declaration as they are marked and referenced in their respective declarations, *e.g.*, Dkt. No. 103-1 is referred to as "Ex. 1."

health mandates and guidelines. *See* Defs. 56.1 ¶¶ 13–15. To address these public health concerns, in addition to the LIRR Mask Compliance Rule described *infra*, the MTA and its subsidiaries (including the LIRR) implemented the "Mask Force" program, which, among other things, provided free disposable masks and hand sanitizer to the riding public. *Id.* ¶ 12.

At all times relevant to this action, the following policies and rules applied to Rosati:

**Collective Bargaining Agreement.** While he was employed by the LIRR, Rosati belonged to a union, the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), which entered into a Collective Bargaining Agreement (the "CBA") with the LIRR on April 4, 2017. *See id.* ¶ 5. Article 42(b) of the CBA provides that, if an employee commits a "major offense," that employee may be subject to pre-investigation suspension where "there is sufficient reason to believe the employee is guilty of the offense" and that he might commit the offense again if "not withheld from service." *Id.* ¶ 6. Under Article 42(f) of the CBA, certain notice procedures and a limitation period apply when an employee is charged with and under investigation for committing an offense within the meaning of the CBA. *See id.* Specifically, (1) an employee must receive written notice of the specific charge(s) against him at least 72 hours in advance of any trial; and (2) as a general matter, no charge may be brought for an offense of which the employee's department head had "actual knowledge" for ten calendar days or more. *See id.*

**LIRR Rules of the Operating Department.** Under General Rule E of the LIRR Rules of the Operating Department ("LIRR Rule E"), "[e]mployees must conduct themselves publicly, at all times, whether on or off company property or paid company time, or whether using any media outlet, in a manner that will not subject the [LIRR] to criticism or loss of good will." *Id.* ¶ 7. LIRR Rule E further provides that "[p]rohibited conduct will be inclusive of but not limited

to conduct on [LIRR] property, use of social media, television, or any other media outlet."  Ex. 1 at 29.[2]

Rule 801 of the LIRR Rules of the Operating Department ("LIRR Rule 801") pertains to the duties and responsibilities for train service employees and provides that conductors "must obey the instructions of Transportation Department supervisors and Train Dispatchers" and "officers of other departments on matters pertaining to those departments."  Defs. 56.1 ¶ 8.

**The LIRR Mask Compliance Rule**.  The LIRR Mask Compliance Rule, effective as of September 14, 2020, required:

> All persons in a terminal, station, or train [are] to comply with lawful orders and directives . . . including one pursuant to an order or directive issued by the Governor of the State of New York pursuant to a state disaster emergency relating to public health or an order or directive issued by the Authority that includes requiring the wearing of masks or face coverings by any individual over the age of two and able to medically tolerate a face covering.  Masks or face coverings must be worn in a manner covering the nose and mouth.  Any person who does not comply with such an order or directive requiring wearing of masks or face coverings in a manner covering the nose and mouth may be barred from entering, or be ejected from, any terminal, station, or train, in addition to a fine of $50.

*Id.* ¶ 11.[3]

---

[2] Citations to Exhibit 1, the Second Amended Complaint and appended materials, use the pagination generated by the Court's ECF system.

[3] Rosati disputes Defendants' assertion that the LIRR Mask Compliance Rule "directly mirrored" New York State Executive Order 202.18, which was issued by Governor Cuomo on April 16, 2022. *See* Pl. 56.1 ¶ 11.  Executive Order 202.18 provides that "[a]ny person utilizing public . . . transportation carriers . . . , who is over age two and able to medically tolerate a face covering, shall wear a mask or face covering over the nose and mouth during any such trip; [and] any person who is operating [a] public . . . transport, shall likewise wear a face covering or mask which covers the nose and mouth while there are any passengers in such vehicle."  N.Y. Exec. Order 202.18 (Apr. 16, 2022), available at https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.18.pdf [https://perma.cc/9XXE-KHKU].

**MTA Policies.**  The MTA Respectful Workplace Policy, effective as of June 18, 2020, prohibits disrespectful conduct, including derogatory comments or jokes based on race or sex, as well as "degrading words or graphics to describe or refer to an individual or group." *See id.* ¶ 9.

The MTA All Agency Social Media Policy, also effective as of June 18, 2020, provides:

> Employees also should be aware that their public statements, including content they post on Social Media, can reflect on the MTA, particularly when their professional affiliation is apparent from the post or their profile page on a Social Media site . . . . Even when an employee uses their own personal device or account outside of work hours, their use of Social Media to threaten, harass, bully, or discriminate against co-workers, customers, contractors, vendors, or suppliers, or to make any threats of violence can violate MTA policies when the Social Media activity negatively affects the workplace or the MTA's ability to serve the public.

Ex. 7-1 at Rosati_LIRR_0212, 214 (admitted as Carrier Exhibit No. 6);[4] *see also* Defs. 56.1 ¶ 10.

### C.  Rosati's Disciplinary History

Rosati's disciplinary record extended over most of his employment with the LIRR, starting in December 2019, when he received a warning letter related to five Absence Control Policy violations in the latter half of 2019.  *See* Defs. 56.1 ¶¶ 41–60.  Prior to his 2021 disciplinary investigation, which underlies this lawsuit, Rosati had been charged with other disciplinary violations related to (i) a January 2020 safety incident when Rosati caused all the cars on a LIRR train to open their doors, even though two train cars were not yet at the platform; and (ii) Rosati's use of sick leave in October and November 2020 to attend various events across Long Island instead of reporting for his assigned shifts.  *Id.* ¶¶ 42–54.  The LIRR initiated disciplinary proceedings with respect to both charges, and, after failing to appear on scheduled

---

[4] Dkt. Nos. 103-7 and 103-8 comprise a true and accurate copy of the transcript of Rosati's disciplinary hearing on April 20, 2021, which includes copies of exhibits admitted at the hearing.  Where relevant, the Court indicates the exhibit number of material entered into evidence at the disciplinary hearing and which is before the Court as part of the undisputed factual record.

trial dates in both proceedings, Rosati ultimately pled guilty and waived his trial rights. *See id.* ¶¶ 44, 54. With respect to the train car incident, Rosati accepted and acknowledged that the disciplinary infraction would remain on his permanent record, *id.* ¶ 44, and as to the sick leave violations, Rosati accepted a fine in the amount of 25% of his regular straight time earnings in lieu of a 30-day suspension. *Id.* ¶ 54.

Rosati's undisputed conduct underlying the 2021 disciplinary investigation began in mid-2020, continued during the same timeframe as Rosati's sick leave violations, and is as follows:

### 1. 2020 Social Media Activity

Between August 2020 to May 2021, while employed by the LIRR, Rosati used several social media outlets, including accounts under his name, accounts under variations of the username "Unfiltered Conservative," pages for his t-shirt business "Clash Brothers United," and pages for an audio podcast associated with "Unfiltered Conservative" and "Clash Brothers United." *See* Defs. 56.1 ¶¶ 16–23.

From August 2020 to October 2020, Rosati recorded and posted multiple videos on his TikTok account that showed him working and/or wearing his LIRR Assistant Conductor uniform. *Id.* ¶¶ 24–31. The majority of these videos were taken while Rosati was on duty on LIRR property, including on moving LIRR trains, while wearing his LIRR uniform. *Id.* ¶¶ 24–25 (August 17 and September 1, 2020), 28 (September 11, 2020), 30–31 (October 9 and 10, 2020).

On October 21, 2020, LIRR Superintendent Michael Bendick and Lead Transportation Manager Benjamin Gallup spoke with Rosati regarding these videos, expressing concern that Rosati had made these videos on LIRR property while in uniform and apparently on duty, and instructing him to refrain from making any future posts and to take down the previously-posted videos. *See id.* ¶ 32; *see also* Ex. 8 at 41:10–16 (Bendick deposition) ("I talked to [Rosati] about

6

not being in uniform and not putting the company in [a] bad light . . . . I did say to him you have to be careful, be careful what you post.  I . . . told him stop making these videos, stop doing it in uniform, you don't want to represent the [LIRR] making statements and stuff like that."), 104:24–05:2 ("And the posts with the [LIRR] . . . I told him he needed to take them down and he never took them down."); Ex. 9 at 16:11–15 (Gallup deposition) ("[The issue with the videos] involved [Rosati] being in uniform in a few different locations that were identifiable as [LIRR] property."); *id.* at 17:8–11("There is a rule about using a cellphone on the train and Mr. Rosati at that point said I won't make any more and I will take down the ones that I previously uploaded.").

### 2.  January 6, 2021 and Investigative Hearing

In December 2020, Rosati submitted a request for a personal day for January 6, 2021, which was approved.  Defs. 56.1 ¶ 33.  On or around January 5, 2021, Rosati requested sick leave to miss his shift for that day; instead of a medical appointment or recuperation at home, Rosati instead used that sick day to travel to Washington D.C.  *Id.* ¶¶ 34–35.  On January 6, 2021, Rosati participated in and was recorded on video at demonstrations on the grounds of the U.S. Capitol building protesting the results of the 2020 Presidential election.  *Id.* ¶¶ 36–37.

On January 7, 2021, an anonymous individual (self-described as a "concerned citizen") sent a letter to then-President of the LIRR Phillip Eng, regarding Rosati's social media activity. *Id.* ¶ 38; *see also* Ex. 7-1 at Rosati_LIRR_0221 (admitted as Carrier Exhibit No. 9).  The letter claimed that Rosati was a member of the Proud Boys, a right-wing group; attached several screenshots of Rosati's social media posts reflecting his participation at "certain rallies" and "harassing fellow citizens about topics such as the 2020 election, COVID-19 vaccines, and various other treasonous activities"; and represented that certain of Rosati's accounts had been

"suspended due to these behaviors." *Id.* Rosati disputes the truth or accuracy of the claims made in the letter. *See* Pl. 56.1 ¶ 38.

On January 14, 2021, Transportation Manager Michelle Walsh observed Rosati, while on duty, walking down the aisle of an LIRR train without his mask fully covering his nose and mouth, in violation of the LIRR Mask Compliance Rule. *See* Defs. 56.1 ¶ 57. Walsh told him he was in violation of the policy and such behavior would result in a disciplinary violation. *Id.* Shortly afterwards, Walsh saw him pull down his mask again. *See id.* ¶ 58; Ex. 13 at 14–15.

A few days later, on January 19, 2021, the LIRR initiated disciplinary action against Rosati, Case No. 032-21, and sent him a notice of trial, apprising him of the disciplinary charges against him regarding his violation of the LIRR Mask Compliance Rule, failure to follow Walsh's instruction, and violation of Corporate Safety Rule 900.3.2. *Id.* ¶ 61. That same day, a Twitter user under the username @wehearttrash[5] posted a still photo from a video showing Rosati at the U.S. Capitol grounds on January 6, 2021, and wrote (tagging the LIRR's official Twitter account): "@LIRR you may want to ask your assistant conductor Steve Rosati what he was doing on Wednesday, January 6th 2021 at the United States capitol." *See id.* ¶ 39; Ex. 7-1 at Rosati_LIRR_0247 (admitted as Carrier Exhibit 10).

On January 20, 2021, Carolyn Kumah of LIRR Human Resources emailed LIRR Deputy General Counsel Stephen Papandon a screenshot of the January 19 Twitter post, as well as screenshots of two other posts by @wehearttrash, one depicting Rosati making an "OK" hand symbol and the other referencing a page from Rosati's entity Clash Brothers United. Defs. 56.1 ¶ 40. These screenshots had been sent to LIRR Diversity by an LIRR employee who wished to

---

[5] The Twitter user now operates under the username @yrtrashhh. Defs. 56.1 ¶ 39.

remain anonymous. *Id.* That same day, Rosati was not present on his assigned train during an inspection by Gallup. *See id.* ¶ 62.

On January 21, 2021, LIRR initiated another disciplinary action against Rosati, Case No. 036-21, and sent Rosati another notice of trial, apprising him of additional disciplinary charges for failing to be present on his assigned train on January 20, citing violations of Rule D of the Rules of the Operating Department, the Corporate Absence Control Policy and Procedure ("AWOL"), and/or the CBA. *Id.* ¶ 62. Later that same day, the LIRR held an investigative hearing into the two disciplinary actions against Rosati (Hearing No. 04-21), regarding his failure to properly wear a mask while on duty and failure to be present on his assigned train. *Id.* ¶ 63. Erin Sherrard, then Manager of the Transportation Trial Office, acted as Investigation Officer, and Rosati was represented by Jay Langlan, a SMART union representative. *Id.* Bendick and Gallup were present as observers. *Id.*

At the beginning of the hearing, Rosati stated that he did not want to answer any questions "without [his] representation." *Id.* ¶ 65. Sherrard informed Rosati that, under the CBA, he was not entitled to have non-SMART union representation, and Rosati reiterated twice that he did not want to answer any questions. *Id.* Then, Gallup identified himself for the record and told Rosati: "I'm going to give you a direct order to cooperate in the investigation [and] provide answers to questions asked. If you fail to comply with this directive, you will be removed from service immediately and be subject to discipline." *Id.* ¶ 66. After allowing Rosati a break to make a telephone call, Sherrard asked Rosati about his social media usage, use of sick leave, and Clash Brothers United. *See* Ex. 14 at Rosati_LIRR_0130; Defs. 56.1 ¶ 72–74. Rosati repeatedly refused to answer Sherrard's questions about Clash Brothers United, claiming that he had already answered them on the record. *Id.* ¶ 75. Gallup reiterated his prior directive to

answer Sherrard's questions and his warning that Rosati's failure to comply would result in his immediate removal from service and potential discipline. *Id.* ¶ 76. Rosati's subsequent responses remained largely non-substantive, including stating "I don't know" in response to a question about his relationship with Clash Brothers United. *See* Pl. 56.1 ¶ 77. When the hearing ended, Gallup informed Rosati that he was being taken out of service without pay, pending the resolution of the disciplinary actions, which was later formalized by notice through certified mail on January 25, 2021. Defs. 56.1 ¶¶ 78–79.

The MTA held a routine press conference, unrelated to Rosati, while Rosati's hearing was ongoing. *Id.* ¶ 63. At the conference, Alfonso Castillo, a Newsday reporter, asked Chairman Foye about Rosati. *Id.* ¶ 67. Castillo specifically asked whether Foye was aware of reports that Rosati participated in the January 6 demonstration at the U.S. Capitol and the subsequent attention on the nature of Rosati's social media activity, and whether any disciplinary action was being taken against Rosati. *Id.* Foye replied, "What [Rosati] said on social media is outrageous, despicable, and [a] sign he's a jackass. His conduct at the Capitol ought to be investigated and is being investigated." *Id.* ¶ 68. Foye had no prior or subsequent involvement in Rosati's discipline or later termination, and directed Castillo's inquiry regarding disciplinary action to Eng. *Id.* Eng responded, "We are investigating the actions in accordance with the CBA. The employee has been relieved of his duties while we conduct the investigation and that's really all I guess I'm at liberty to say now while we do this." *Id.* ¶ 69.

### 3. April 20, 2021 Disciplinary Hearing

January 29, 2021 was the initial trial date for Rosati's pending disciplinary actions involving his failure to properly wear a face mask on January 14, 2021, and his failure to be present on his assigned train on January 20, 2021. Defs. 56.1 ¶ 80. Rosati failed to appear, and the trial was rescheduled for February 5, 2021. *Id.*

10

On January 29, 2021, LIRR also sent Rosati notices of trial for three additional disciplinary actions, Case Nos. 043-21, 044-21, and 045-21, arising from the January 21 investigative hearing and continued investigation of Rosati's conduct. *Id.* ¶ 81. The disciplinary actions charged Rosati as follows:

- <u>Case No. 043-21</u>: Failure to follow a supervisor's directive, violation of the CBA's sick leave provision, and/or violation of Section B.4 of the Corporate Absence Control Policy, given an alleged "demonstrate[d] pattern of abuse" of Rosati's use of sick leave on January 5, 11, and 15, 2021. *Id.* ¶ 82.

- <u>Case No. 044-21</u>: Conduct unbecoming an employee of the LIRR, violation of the Dual Employment Policy, and violation of the MTA All Agency Code of Ethics, based on Rosati's alleged unauthorized secondary employment or activity with "Clashbrothers United." *Id.* ¶ 83.

- <u>Case No. 045-21</u>: Conduct unbecoming an employee of the LIRR, violation of the MTA Respectful Workplace Policy, violation of the MTA Social Media Policy, violation of LIRR Rule E, and violation of LIRR Rule 801, based on Rosati's social media activity, which identified him as an LIRR employee and "revealed offensive language and conduct." *Id.* ¶ 84.

The trial date for the three additional disciplinary actions was also scheduled for February 5, 2021. *Id.* ¶ 85.

The trial date for all five disciplinary actions was rescheduled multiple times at Rosati's request and was ultimately held on April 20, 2021. *Id.* Sherrard served as the trial officer, and Bendick was the LIRR's sole witness. *Id.* ¶ 86. Rosati was represented by SMART union representatives Langlan and EJ Chino. *Id.*

11

The evidence presented during the disciplinary hearing included the various policies governing Rosati's conduct, Rosati's social media activity, and the increasing public attention on Rosati and the LIRR in connection with Rosati's participation in the January 6 demonstration. At the outset, Bendick read provisions of the MTA Respectful Workplace Policy, MTA Social Media Policy, and LIRR Rule E, and stated that Rosati knew of these policies and was expected to abide by them. *Id.* ¶ 87.[6] Among other materials, the LIRR introduced the following as evidence: (1) the anonymous January 7, 2021 letter to Eng (Carrier Exhibit 9); (2) the January 20, 2021 email from Kumah to Panpandon regarding the @wehearttrash Twitter post (Carrier Exhibit 10); (3) news reports concerning Rosati's social media activity and participation in the January 6 demonstration, and identifying Rosati as an LIRR Assistant Conductor (Carrier Exhibits 11–13); and (4) several social media posts by Rosati, including the videos Bendick had directed Rosati to take down in October 2020, a video of Rosati making an "OK" hand symbol,[7] and a video of Rosati yelling on a megaphone at people standing in line along with a caption stating: "look at idiot mask wearers lined up to take a covid test.  Someone's got to tell them they are fools" (Carrier Exhibits 15–17k). *Id.* ¶¶ 88–94, 97.

Bendick testified regarding his conversation with Rosati on October 21, 2020, concerning Rosati's videos depicting him on LIRR property and/or in uniform. *Id.* ¶ 98.  Bendick explained

---

[6] Defendants' 56.1 Statement cites an inaccurate Bates-range in Ex. 7-1 which should be Rosati_LIRR_0155–58.

[7] Rosati disputes that the "OK" hand symbol has "been credibly associated with white supremacist ideology" and claims he was unaware of any association between the symbol and white supremacy.  *See* Pls. 56.1 ¶¶ 103–06; *see also* Ex. 7-2 at Rosati_LIRR_0283 ("[S]omeone who uses the symbol cannot be assumed to be using the symbol in either a trolling or, especially, white supremacist context unless other contextual evidence exists to support the contention."); Mot. at 12 n.3 (clarifying that the video depicting Rosati making the "OK" hand symbol that was introduced at the disciplinary hearing is different from a video described in the Second Amended Complaint).  Whether or not Rosati was intentionally using the "OK" hand symbol to connote white supremacy is immaterial to the Court's holding that Defendants are entitled to summary judgment, as described further *infra*.

how the videos were violative of LIRR and MTA policies and undermined the public perception

of the LIRR and Rosati's perceived ability to discharge his duties as an LIRR employee:

> Our biggest concern is obviously throughout these social media posts, in various platforms, he is in uniform. He's on a train and in some cases identified as working. In some cases he is . . . talking about masks which is something the MTA strongly believes that we need our employees for [sic] our safety and to keep our infrastructure running. We need to have customers wearing masks, our employees wear[ing] masks, so[] people will come to ride our trains, so that's a concern to us.

Ex. 7-1 at Rosati_LIRR_0166; *see also* Defs. 56.1 ¶ 100. Bendick also testified that Rosati's

conduct, namely his "insubordination," was unsafe, which is what warranted his removal from

service. *Id.* at Rosati_LIRR_0177 ("Like I said, the company is now in bad faith; so, it could be

unsafe for the employees who work in trains, could be unsafe for himself, could be unsafe for

many people."). Rosati represented that Bendick had told him that if he stopped making such

videos, there would be no disciplinary action against him, which Bendick denied. Defs. 56.1 ¶

99.

Superintendent Jeffrey Stevens reviewed the trial transcript of the April 20, 2021 hearing

and terminated Rosati on May 11, 2021.[8] *Id.* ¶ 101. Stevens had no other role in Rosati's

disciplinary process. *Id.*

## II.    PROCEDURAL HISTORY

Rosati initiated this action on October 19, 2021. Dkt. No. 1. Following motion practice

before the Hon. Lorna G. Schofield, then presiding over this action, Rosati filed the operative

---

[8] At some point after Rosati's termination, Rosati filed an arbitration claim against the LIRR, at which the arbitrator upheld his termination. On October 7 and 10, 2024, the parties filed letters regarding the arbitration, which was still pending at the time of Defendants' moving papers. *See* Dkt. Nos. 108 & 109. The outcome of Rosati's arbitration is of no moment to the Court's reasoning in granting summary judgment in favor of Defendants, which centers on events leading up to and including Rosati's termination, so the Court will decline to consider the merits or substance of the arbitrator's written decision. *See* Defs. 56.1 ¶ 102 (referencing Rosati's union arbitration); Reply at 10.

13

Second Amended Complaint on October 14, 2022, Dkt. No. 41 ("SAC"), which Defendants answered on October 21, 2022. Dkt. No. 42.

In the Second Amended Complaint, Rosati alleges that Defendants unlawfully initiated an "illegitimate" investigation against him, suspended him without pay, and terminated him, all of which was "in response to his presence at the Capitol on January 6, 2021" and the exercise of his free speech rights. *See* SAC ¶¶ 59–81. Specifically, Rosati claims that the reasons behind the investigation, his suspension, and his termination, *i.e.*, his 2020 social media activity and conduct, were pretextual and an ad-hoc rationale to justify retaliating against him for attending the January 6 demonstration, as evidenced by the timing of the investigation in connection with the January 19, 2021 Twitter post and Foye's comments at the January 21, 2021 press conference. *See id.* ¶¶ 66–70, 73–75. Because Defendants were allegedly substantially motivated by their disapproval of Rosati's political viewpoints, Rosati asserts that Defendants' actions violate his First Amendment rights and New York Labor Law. *See id.* ¶¶ 78–79, 87. Rosati further asserts that the charges related to his social media activity were brought more than ten days after Defendants had "actual knowledge" of Rosati's conduct, in violation of the terms and conditions of the CBA. *See id.* ¶¶ 91 & 93.

On April 1, 2024, this action was reassigned to the undersigned. *See* Dkt. No. 98. Defendants' motion for summary judgment on all claims is fully briefed and before the Court for decision. Dkt. Nos. 99, 102, 106, 107.

## DISCUSSION

I.    **LEGAL STANDARD ON SUMMARY JUDGMENT**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

14

R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).[9] "The court's role with respect to . . . a motion [for summary judgment] is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024). "In determining whether genuine issues of fact exist, the district court may not properly consider the record in piecemeal fashion," and must "review the record taken as a whole," drawing all reasonable inferences in favor of the nonmovant. *Id.* at 227.

If the movant demonstrates the absence of any genuine dispute as to all material facts, the non-movant must point to evidence that would be sufficient to support a jury verdict in his favor. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). If, based on the record before the Court, a claim has arguable merit, then summary judgment cannot be granted. *Moll*, 94 F.4th at 228; *Am. Home Assurance Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) ("If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."). However, a nonmovant's "reliance upon conclusory statements or mere allegations will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228. Summary judgment is proper where the nonmovant "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.*

---

[9] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

## II.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS

After lengthy discovery, Rosati cannot point to any substantive evidence that he was wrongfully subjected to internal investigation, suspension, and termination by the LIRR in violation of his rights under federal or state law.  Based on the undisputed factual record before the Court, a reasonable jury could not find in favor of Rosati on either his First Amendment claim or New York Labor Law claim.  Rosati's remaining breach of contract claim must also be dismissed because he lacks a private right of action under the CBA.

### A.  Rosati Cannot Prevail on His First Amendment Claim Because Defendants Justifiably Disciplined Him

To prevail on a claim of First Amendment retaliation, a plaintiff must prove "(1) that the speech or conduct at issue was protected from the particular retaliatory act alleged; (2) that the retaliatory act qualifies as an adverse action taken against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action." *Heim v. Daniel*, 81 F.4th 212, 221 (2d Cir. 2023).  "Even if the plaintiff makes out a *prima facie* retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011).

Defendants do not dispute that some of Rosati's speech for which he was disciplined, *i.e.*, Rosati's social media posts which were the subject of the investigation and charges, relate to matters of public concern.  Mot. at. 12.  Rosati's expression of his views on the response to the COVID-19 pandemic (including masking) and the 2020 presidential election clearly involve matters of public concern. *See* Defs. 56.1 ¶¶ 92, 97; *Persaud v. City of New York*, No. 22-CV-02919 (AS), 2024 WL 2159852, at *3 (S.D.N.Y. May 14, 2024) (explaining the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern") (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)); *see also*

16

*Locurto v. Giuliani*, 447 F.3d 159, 175 (2d Cir. 2006) ("It is more sensible, instead, to treat off-duty, non-work-related speech as presumptively entitled to First Amendment protections . . . .").

Defendants similarly do not appear to dispute that their termination of Rosati constitutes an adverse action.[10] *See Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) ("The list of adverse actions has included harsh measures, such as discharge . . . and reprimand, as well as some lesser sanctions[.]"); *see, e.g.*, *Persaud*, 2024 WL 2159852, at *4.

The parties *do* dispute whether Rosati has established a causal connection between his putatively protected conduct and speech, *i.e.*, his participation in the January 6 demonstration and the expression of his political views, and his termination. Mot. at 17–21; Opp. at 6, 10–13. Defendants argue that Rosati has failed to show a causal connection between his termination and this conduct and speech, and also that they justifiably disciplined Rosati for at least some of his speech and conduct and are entitled to a defense under (1) *Pickering v. Board of Education* because the likely or actual disruptive effect of Rosati's speech outweighed his interest in such speech and (2) *Mount Healthy City School District Board of Education v. Doyle* because Defendants would have taken the same adverse actions even in the absence of Rosati's protected speech. *See* Mot. at 12–16, 22.

The Court finds that Defendants are entitled to summary judgment because, even if some of Rosati's protected speech and conduct played a role in his termination, Defendants have satisfied the *Pickering* test and demonstrated that Rosati's "expression was likely to disrupt

---

[10] In his opposition, Rosati primarily focuses on his termination as the actionable adverse action. *See* Opp. at 6–14. It is undisputed that Defendants' disciplinary investigation into Rosati initially stemmed from his failure to properly wear a mask on January 14, 2021 and his failure to appear on his assigned train on January 20, 2021, both of which go towards Rosati's ability to discharge his duties as an assistant conductor consistent with LIRR regulations. *See* Defs. 56.1 ¶¶ 61–62. Rosati does not point to any evidence in the record that Defendants were acting in retaliation against the content of his expression in initiating or carrying out the disciplinary investigation leading up to his termination.

[their] activities and that the harm caused by the disruption outweighs the value of [Rosati's] expression."[11] *Anemone*, 629 F.3d at 115.

### 1. Governing Law

While a public employee "does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," a public employee "must generally by necessity accept certain limitations on their First Amendment freedoms because . . . their speech can contravene governmental policies or impair the proper performance of governmental functions." *Heim*, 81 F.4th at 223; *see also Manon v. Pons*, 131 F. Supp. 3d 219, 229 (S.D.N.Y. 2015) ("The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.").

Accordingly, to determine whether a public employee's speech is insulated from any on-the-job consequences, courts apply the *Pickering* test, as adopted in *Pickering v. Board of Education*, 391 U.S. 563 (1968), which requires courts to "seek a balance between the interest of the employee, as a citizen, in commenting upon matter[s] of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through

---

[11] The reasoning behind the Court's holding that, if there were any causal connection, Defendants are entitled to a *Pickering* defense applies with equal force to Rosati's failure to establish the causal connection between his speech and expressive conduct and his termination.

Because the Court holds that Defendants have established a *Pickering* defense, the Court does not reach whether Defendants are entitled to a *Mt. Healthy* defense. *But see Severin v. New York City Dep't of Educ.*, No. 19-CV-00775 (MKV), 2023 WL 2752973, at *10 (S.D.N.Y. Mar. 31, 2023) ("The Second Circuit has . . . repeatedly upheld decisions to grant summary judgment based on a *Mount Healthy* defense where uncontroverted evidence established that the plaintiff's own misconduct justified his termination."); *Heil v. Santoro*, 147 F.3d 103, 110–11 (2d Cir. 1998) (holding a government employer can avoid liability "even if there is evidence that the adverse employment action was motivated in part by protected speech" where there was no evidence suggesting that the employer "would not ordinarily have disciplined" an employee for such misconduct); *Cestaro v. Rodriguez*, No. 24-973-cv, 2025 WL 783636, at *2 (2d Cir. Mar. 12, 2025) (holding the defendants were entitled to a *Mt. Healthy* defense where they revoked the plaintiff's promotion based on his unprofessional and aggressive behavior towards a train conductor in a TikTok video).

18

its employees." *Whitfield v. City of New York*, 760 F. Supp. 3d 126, 139 (S.D.N.Y. 2024) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)); *see also Heim*, 81 F.4th at 223 (citing *Connick* as articulating "the common sense realization underpinning *Pickering* that government offices could not function if every employment decision became a constitutional matter"); *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015) (describing the *Pickering* test as safeguarding the government's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees") (quoting *Piscottano v. Murphy*, 511 F.3d 247, 269 (2d Cir. 2007)).

The first question is "whether the employee spoke as a citizen on a matter of public concern." *Heim*, 81 F.4th at 223. If so, the next question is whether the government employer "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015); *see Persaud*, 2024 WL 2159852, at *6 ("In other words, assuming that [the employee's] speech was the basis for the adverse actions, *Pickering* asks whether the government was justified."). Where a plaintiff's expressive activity precipitates his dismissal, the government must show (1) "the employee's activity was likely to interfere with Government operations" and (2) "the Government acted in response to that likely interference and not in retaliation for the contents of the speech." *Locurto*, 447 F.3d at 176; *see also Anemone*, 629 F.3d at 115 (describing *Pickering* as a balancing test and a defense permitting a government employer to take adverse action against an employee for speech on matters of public concern if (1) the government employer reasonably predicts the speech will be disruptive; (2) the potential for disruption outweighs the speech's value; and (3) the government employer took the adverse employment action because of the potential for disruption and not in retaliation for speech). "If

the Government carries its burden, a reviewing court then weighs the potential disruptiveness against the value of the speech to the plaintiff." *Locurto*, 447 F.3d at 176. Even if the balance of interests weighs in the government employer's favor, a plaintiff may still prevail "by proving that the adverse action was in fact motivated by retaliation rather than by fear of disruption." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003)); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 557–58 (2d Cir. 2001) (holding the defendants were not entitled to a *Pickering* defense where there were questions of fact regarding the true motivation behind the plaintiffs' dismissal).

### 2.    Application

As discussed above, Defendants had several bases, unrelated to any conduct or speech of Rosati's that could be protected, for disciplining and terminating him, including his abuse of sick leave, safety incidents, and failure to follow supervisory directives on a number of occasions. However, even assuming for purposes of this motion that Rosati was terminated solely for speech and conduct that could possibly be protected by the First Amendment, Defendants are still entitled to summary judgment. The evidentiary record before the Court contains no genuine dispute of material fact over Defendants' motivation behind terminating Rosati. The totality of the circumstances makes clear that the termination decision was driven by concerns about disruption to public services as opposed to improper viewpoint-based retaliatory animus. Viewing the evidence in the light most favorable to Rosati, and drawing all permissible inferences in favor of him, Rosati's assertions that he was terminated because of the content of his political views are entirely speculative and without any foundation in the record.

Rosati's social media readily identified him as an employee of the LIRR because he had posted videos of himself in which he was obviously on duty or in uniform and/or on LIRR property. Accordingly, a member of the public was able to tag and directly implicate the LIRR

in the viral January 19 Twitter post about Rosati, and, in the ensuing days, the press, other LIRR employees, and members of the public were similarly able to directly and publicly associate the LIRR with Rosati's other social media activity, and contacted or complained to the LIRR about him.  This chain of events and other instances of Rosati's disorderly conduct, insubordination, and unruly public behavior, including (i) his failure to comply with Walsh's directive to properly wear his mask in accordance with LIRR regulations while on duty and inside a train car with passengers present, and (ii) a publicly-posted video that showed him harassing members of the public with a megaphone while they waited in line to receive COVID testing, steeped the LIRR in controversy and was part of the disciplinary hearing record.[12]

At the disciplinary hearing, Bendick expressed several concerns with Rosati's social media activity, including his belief that, because Rosati posted videos in uniform and/or on LIRR property, the posts could cause customers to "lose faith" in the LIRR, put the LIRR in a "bad [light]," and undermine the LIRR's enforcement of its mask protocols, which were key to maintaining public services and attracting and retaining ridership in the wake of COVID-related shutdowns.  *See, e.g.*, Ex. 7-1 at Rosati_LIRR_0161, 166, 175, 178.

The undisputed record shows that Defendants terminated Rosati because of the combination of (i) his numerous disciplinary infractions, including abuse of sick leave, safety violations, and insubordination; (ii) the actual disruption caused by his speech and conduct, including his misuse of sick leave to attend the January 6 demonstration and the complaints and ensuing controversy from the public and his co-workers thereafter; and (iii) the further disruptive potential of his speech and conduct related to the COVID pandemic, some of which Rosati had

---

[12] In his opposition, Rosati claims the record contains "a very significant evidentiary problem" because the Carrier Exhibits were not appended to Defendants' 56.1 Statement.  Opp. at 7.  This argument ignores that the carrier exhibits are included in Dkt. No. 103-7.

himself explicitly connected to the LIRR by posting videos while in LIRR uniform or on LIRR property, or posting videos from the same account where prior posts had clearly identified him as an LIRR employee.  That actual or potential disruption included (i) the potential negative effect on LIRR riders' trust that LIRR and its employees cared about and would ensure their safety, including Rosati's ability or willingness to personally comply with the LIRR's mask protocols and enforce them for passengers; and (ii) the implied association of the LIRR with a highly divisive and partisan political event, when the LIRR was engaged in the provision of a public service to a broad swath of citizens in a non-partisan manner and was specifically working to draw riders back to the system following COVID-related shutdowns.  Defendants' core interest as an employer in the efficiency and effectiveness of its services was clearly undermined by the circumstances of Rosati's speech, its express association with the LIRR, and the fact that it had become widely known to the public and to at least one of his co-workers.  *See, e.g., Castine v. Zurlo*, 756 F.3d 171, 175–76 (2d Cir. 2014) (collecting cases); *cf. Mumma v. Pathway Vet All., LLC*, 648 F. Supp. 3d 373, 392 (D. Conn. 2023) (finding material questions of fact on the issue of pretext where the reason provided for the underlying termination was that the plaintiff had "posted something to social media that was offensive and derogatory to multiple groups of people," not potential impacts of the company's operations or fear of legal liability).  As the Supreme Court has articulated:

> We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. . . . Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.

*Rankin*, 483 U.S. at 388.

22

In his opposition, Rosati repeatedly argues that Defendants have no evidence to support their *Pickering* defense. *See, e.g.,* Opp. at 8–10.[13] The Court fails to see how this is true given the ample evidence showing how Rosati's conduct harmed the LIRR's operation and public perception, and posed a clear and articulable ongoing risk. Rather, it is Rosati who has failed to point to any evidence or genuine dispute of material fact which would preclude summary judgment in favor of Defendants. While Rosati argues that his speech did not cause or pose a risk of interference with the LIRR's operations, he does not cite any record evidence that supports his claims. *See* Opp. at 8. He similarly cites no evidence that it was the *content* or *viewpoint* expressed in his political activity or social media posts, as opposed to the ensuing controversy derived from highly partisan activity being linked to the LIRR itself that contributed to his termination, regardless of which "side" the posts or activity supported. Finally, to the extent that the content or viewpoint of Rosati's posts and conduct related to the Covid pandemic played any role, it was an opinion or conduct that was directly contrary to the LIRR's policies and public messaging to the riding public, and yet linked by Rosati to the LIRR either explicitly or implicitly. *Id.* at 9–10.

Rosati's attempt to cast *Locurto* as inapplicable or distinguishable is unavailing. *Id.* at 10. There, the Second Circuit disagreed with the district court's conclusion that certain dismissals were retaliatory or otherwise improper. *Locurto*, 447 F.3d at 177. The Second Circuit reasoned that it was permissible for the defendants to be driven by concerns over public

---

[13] Rosati also argues Foye's comment that Rosati was a "jackass" show Rosati's termination derived from his mere participation at the "January 6 political protest." *See* Opp. at 10. Foye's comment at the press conference does not suggest that Rosati's termination was impermissibly based on the content of his speech because Foye was not a part of Rosati's disciplinary hearing or the decision to terminate his employment. Rosati also cherry-picks parts of Kustoff's deposition testimony to argue Rosati's attendance as the protest was the "real reason" Defendants terminated his employment. *See* Opp. at 12. But, again, Kustoff was not a part of the disciplinary hearing or decision-making process that culminated in Rosati's termination.

23

perception of the NYPD and FDNY as racist, in part because "[w]here a [g]overnment employee's job quintessentially involves public contact, the [g]overnment may take into account the public perception of that employee's expressive acts in determining whether those acts are disruptive to the [g]overnment's operations." *Id.* at 179. Rosati's role as an assistant conductor quintessentially involved public contact, and he was charged with protecting riders' health and safety by enforcing the LIRR's COVID protocols, including mask-wearing by employees and riders. It was therefore permissible for Defendants to be driven by concerns over public perception of its protection of riders' health and safety and efforts to limit the exposure and transmission of COVID-19.[14]

In sum, even viewing the undisputed factual record in the light most favorable to Rosati, there is no reasonable material factual dispute that Defendants concluded Rosati's speech and conduct had interfered with operations and posed a threat of continued interference with operations, that the disruptive nature of his speech outweighed his personal interests, and that Defendants terminated Rosati based on these concerns in combination with his numerous other infractions unrelated to potentially protected speech or conduct. Accordingly, Defendants have successfully made out a *Pickering* defense and summary judgment is granted in favor of Defendants on Rosati's First Amendment retaliation claim.

### B. Rosati Cannot Prevail on His New York Labor Law Claim

For substantially the same reasoning above, summary judgment is granted in favor of Defendants on Rosati's New York Labor Law § 201-d claim. Under § 201-d, "it shall be

---

[14] At the disciplinary hearing, Bendick also described his belief that Rosati's conduct had violated the MTA Respectful Workplace Policy and the MTA Social Media Policy. *See, e.g.*, Ex. 7-1 at Rosati_LIRR_0166–67, 171, 178–79. In context, Bendick's belief similarly stemmed from his overarching concern with disruption caused by the controversy generated by Rosati's social media, including the impact on customers' perception of and willingness to ride the LIRR.

unlawful for any employer . . . to discharge from employment or otherwise discriminate against an individual . . . because of an individual's political activities outside of working hours, off of the employer's premises and without use of the employer's equipment or other property, if such activities are legal[.]" N.Y.L.L. § 201-d(2)(a). Rosati's claim under § 201-d is "predicated on the same set of facts as [his] First Amendment retaliation claim," Opp. at 16, and his claim fails on the merits for the same reasons that his First Amendment retaliation claim fails, given the Court's holding that Rosati was not terminated because of his expressive political conduct or espoused political views.[15]

**C. Rosati Does Not Have a Private Right of Action on His CBA Claim**

It is well-settled that an individual member of a union lacks standing to bring a claim against his employer about the terms and conditions of employment, except through his union. *See, e.g., Ramsaroop v. Dep't of Educ. of City of New York*, No. 20-CV-04947 (ER), 2022 WL 376029, at *10 (S.D.N.Y. Feb. 8, 2022); *Biehner v. City of New York*, No. 19-CV-09646 (JGK), 2021 WL 878476, at *7 (S.D.N.Y. Mar. 9, 2021); *Cummings v. City of New York*, No. 19-CV-07723 (CM) OTW), 2020 WL 882335, at *14 (S.D.N.Y. Feb. 24, 2020); *Picott v. Chatmon*, No. 12-CV-07202 (ER), 2017 WL 4159900, at *10 (S.D.N.Y. Sept. 18, 2017); *see generally Berlyn v. Bd. of Educ. of E. Meadow Union Free Sch. Dist.*, 55 N.Y.2d 912, 912 (1982). "Limiting employees to the remedies established by the [collective bargaining agreement] respects the

---

[15] The parties dispute whether the Court has jurisdiction over this claim. Defendants claim the New York State Court of Claims has exclusive jurisdiction over § 201-d claims against state actors and individuals acting in an official capacity, citing to a single case from the Western District of New York, which did not rely on any authority for this assertion. *See* Mot. at 23 (citing *Rusk v. New York State Thruway Auth.*, 37 F. Supp. 3d 578, 600 (W.D.N.Y. 2014)). In the briefing before the *Rusk* Court, the State cited to a New York Appellate Division case from nearly three decades ago, *Cavanaugh v. Doherty*, 243 A.D.2d 92 (3d Dep't 1998), in which the court held that the lower court had correctly determined that it did not have jurisdiction over a § 201-d claim. Given the dearth of recent, binding, or persuasive authority on this issue, and the above alternative basis for summary judgment, the Court declines to rule on Defendants' jurisdictional argument.

outcome of the collective bargaining process and protects the union's ability to negotiate on behalf of employees moving forward." *Dourdounas v. City of New York*, 44 N.Y.3d 34, 40(N.Y. 2025).

It is undisputed Rosati is bound by the CBA through his membership with SMART Union, and therefore a "party" to the CBA. Under the CBA, Rosati is precluded from bringing a direct private action on the question of whether the disciplinary process undertaken by Defendants comported with the CBA.[16] Accordingly, Defendants are granted summary judgment on Rosati's breach of contract claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to enter judgment accordingly and CLOSE this case.

Dated: March 18, 2026
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

---

[16] In his opposition, Rosati argues that "[t]here is a triable issue of fact with respect to whether [he] received fair representation." Opp. at 20. In the Second Amended Complaint, Rosati's breach of contract claim is not premised on any such allegations and solely alleges that Defendants breached the CBA in bringing the charges on January 21, 2021, over ten calendar days after Rosati alleges Defendants had "actual knowledge" of his 2020 social media activity. *See* SAC ¶¶ 89–94.